J-A03003-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| :--- | :--- | :--- |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KENNETH M. REEVES | : | |
| | : | |
| Appellant | : | No. 1566 WDA 2017 |

Appeal from the Judgment of Sentence August 28, 2017
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s): CP-02-CR-0001958-2015

BEFORE: BOWES, J., SHOGAN, J., and STRASSBURGER*, J.

MEMORANDUM BY BOWES, J.: FILED JULY 25, 2019

Kenneth M. Reeves appeals from the judgment of sentence of twenty-two and one-half to forty-five years of incarceration imposed following his conviction of murder of the third degree, aggravated assault, and endangering the welfare of a child ("EWOC"). We affirm.

The trial court provided the following summary of the facts underlying this appeal.

> On Saturday, December 6, 2014, detectives with the Pittsburgh Police were notified that a five-and-a-half-month old female child was found unresponsive and not breathing inside of 417 Parklow Street in the City of Pittsburgh. Detectives were advised that the child, who would later be identified as [K.N.] (hereinafter referred to as "victim"), was transported to Children's Hospital for evaluation and treatment. Upon receiving this information, detectives went to Children's Hospital, and, when they arrived, detectives observed medical personnel attempting to resuscitate the victim. The emergency room attending physician told investigators the victim was being placed on a ventilator in the Intensive Care Unit and was listed in critical but stable condition.

---

\* Retired Senior Judge assigned to the Superior Court.

While at Children's Hospital, detectives spoke with paramedics who told them that, upon arrival at the victim's residence, they discovered the victim lying on the floor. . . . [W]hen they initially assessed the victim, she was unresponsive, had no pulse, and was not breathing. Paramedics immediately began resuscitation efforts and continued those efforts as they transported victim to Children's Hospital.

[D]etectives conducted an initial interview of the victim's mother, Julie Vojtash[, who] told detectives that she had placed the victim in her crib, located on the third floor of the residence, at approximately 8:00 p.m., and stated that the victim quickly fell asleep. [Ms.] Vojtash went on to explain that the victim had recently begun teething, which caused her to become fussy at times, but described her daughter as an otherwise happy, healthy baby.

During her initial interview, [Ms.] Vojtash told investigators that [Appellant] was her boyfriend, and explained that he arrived at her residence at approximately 9:30 p.m. on the date of the incident. At the time of [Appellant's] arrival, [Ms.] Vojtash was babysitting her sister's children, who lived on the first floor of the residence. At approximately 10:00 p.m., [Ms.] Vojtash left [Appellant] and the victim - who was asleep in her crib – on the third floor and went downstairs to check on the other children. While downstairs speaking with her brother, [Ms.] Vojtash heard the victim crying loudly, and, when she went back to the third floor, she observed the victim awake and crying in her crib.

When [Ms.] Vojtash asked [Appellant] what had occurred, he replied: "I don't know." Within minutes of [Ms.] Vojtash returning to the third floor, the victim lost consciousness and stopped breathing, while her mother was still holding her. After placing the victim on the floor and calling 911, [Ms.] Vojtash and her brother began performing CPR.

During a subsequent interview, [Ms.] Vojtash recalled two recent incidents in which she had briefly left the victim alone with [Appellant]. On both occasions, she returned to find the victim crying loudly for no obvious reason. [Ms.] Vojtash told detectives that she did not suspect anything unusual when she discovered the victim crying, telling investigators that she attributed the victim's crying to teething pain.

- 2 -

In the course of their investigation, detectives traveled to the victim's [home, where they encountered Appellant, who] provided false identification information because he was on probation for a previous conviction of [EWOC] and aggravated assault [of a prior girlfriend's four-year-old son]. Police also discovered a suboxone pill and two stamp bags of suspected heroin with [Appellant's] belongings. . . .

On Monday, December 8, 2014, detectives returned to Children's Hospital . . . and spoke with the attending physician and a social worker, who advised them that the victim was technically brain dead and that arrangements were being made with [Ms.] Vojtash to determine when lifesaving efforts would be discontinued. On that same day, detectives met with a caseworker from Allegheny County Children, Youth & Families[, who] informed detectives that Dr. Rachel Berger[, a board certified pediatric physician] from Children's Hospital[,] had diagnosed [that] the victim suffered an acute subdural hematoma and cerebral edema . . . caused by recent head trauma, which would have caused her to exhibit signs and symptoms associated with head trauma not long after the precipitating injury occurred. Dr. Berger also advised the caseworker that the emergency room notes referenced bruising on the victim's left temple and right arm.

Detectives . . . [spoke to] Dr. Janet Squires, who . . . confirmed Dr. Berger's findings, and added that the victim had also suffered extensive bilateral retinal hemorrhaging with vitreous hemorrhage, which, along with the other injuries, clearly evidenced physical abuse. Doctors confirmed that the victim did not have any underlying medical conditions which would predispose her to injuries which ultimately led to her death.

The victim was taken off life support on December [10], 2014, and was subsequently pronounced deceased later that same day. On December 30, 2014, the Allegheny County District Attorney's Office received confirmation from the Allegheny County Medical Examiner's Office that the victim's cause of death was blunt force trauma to the head, and the manner of death was homicide.

Trial Court Opinion, 4/9/18, at 2-6.

Appellant was arrested and charged with the above-referenced crimes. On December 10, 2014, Appellant consented to a videotaped interrogation by police detectives. During the interview, Appellant denied inflicting the injuries that caused the victim's death, but admitted that he was alone with her before she started crying, lost consciousness, and stopped breathing. The Commonwealth and Appellant filed numerous pretrial motions, including cross-motions to preclude the introduction of medical expert evidence and testimony. Appellant also filed pretrial motions to preclude the introduction of prior bad acts evidence, including his prior convictions of EWOC and aggravated assault. At a hearing to address the pretrial motions, Appellant's counsel also sought redaction of sixty-five portions of the interrogation video. The trial court agreed to redact several parts of the video, but denied redaction of the remaining portions.

A jury trial commenced on May 22, 2017, at which Allegheny County Detective Kevin McCue testified regarding his investigation of the severe beating of H.P., the four-year-old son of Appellant's prior girlfriend. The detective testified that H.P.'s mother left him in Appellant's care for a few hours, and when she returned, she observed extensive bruising. He further testified that the bruising was visible on H.P.'s jaw, chin, cheek, chest, torso, arms, sides, back, genitals, buttocks, hips, legs, and he had red marks on the top of his head. According to the detective, Appellant initially denied beating

H.P. and claimed that the boy had fallen off the couch; however, he ultimately pled guilty to aggravated assault and EWOC.

The Commonwealth also presented the testimony of two of K.N.'s cousins, who testified that they had seen Appellant behaving aggressively toward the victim and causing her to cry in the weeks leading up to her death, including picking her up by one leg and swinging her back and forth, throwing her up in the air, and grabbing and shaking her. The Commonwealth also offered the testimony of Rachel Berger, M.D., an expert in pediatric brain injuries from Children's Hospital; Abdulrezak Shakir, M.D., the pathologist who performed the victim's autopsy; and Bennet Omalu, M.D., a world-renowned pathologist and Chief Medical Examiner of San Joaquin County, California, who performed an independent investigation into the victim's death at the Commonwealth's request.

At the conclusion of the trial, the jury convicted Appellant of murder of the third degree, aggravated assault, and EWOC. On August 28, 2017, the trial court sentenced Appellant to twenty to forty years of incarceration for murder, followed by two and one-half to five years of incarceration for EWOC.[1] Appellant timely filed post-sentence motions, which the trial court denied.

_____

[1] The aggravated assault conviction merged with the third-degree murder conviction for sentencing purposes. On that same date, Appellant entered a negotiated guilty plea to multiple counts of possession of controlled substances and related offenses.

Appellant thereafter filed a timely notice of appeal and a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

Appellant raises the following issues for our review:

1. Whether the trial court abused its discretion in permitting the Commonwealth to present evidence of [Appellant's] prior conviction[s]?

2. Whether the trial court abused its discretion when it denied [Appellant's] motion in limine to exclude or edit the interrogation video?

3. Whether the trial court abused its discretion in permitting the Commonwealth to introduce the testimony of Dr. Bennet Omalu?

4. Whether the evidence presented by the Commonwealth was sufficient to support the convictions of third[-]degree [-]murder, aggravated assault, and [EWOC] against [Appellant]?

Appellant's brief at 3 (issues reordered for ease of disposition).

In his first and second issues, Appellant contends that the trial court erred by denying his motions in limine. In reviewing the grant or denial of a motion in limine, this Court applies an abuse of discretion standard of review. See Commonwealth v. Stokes, 78 A.3d 644, 654 (Pa.Super. 2013). "An abuse of discretion will not be found based on a mere error of judgment, but rather exists where the court has reached a conclusion which overrides or misapplies the law, or where the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." Commonwealth v. Alicia, 92 A.3d 753, 760 (Pa. 2014).

Regarding his first issue, Appellant claims the trial court abused its discretion in denying his motion in limine to exclude evidence of his prior convictions. Pursuant to Pa.R.E. 404(b)(1), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. In a criminal case this evidence is admissible only if the probative value of the evidence outweighs its potential for unfair prejudice." Pa.R.E. 404(b)(2).

Appellant also claims that the trial court abused its discretion in denying his request for a mistrial following the prosecutor's references to his prior convictions. A motion for a mistrial is within the discretion of the trial court. Commonwealth v. Tejeda, 834 A.2d 619, 623 (Pa.Super. 2003). A mistrial upon motion of one of the parties is required only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial trial. Id. It is within the trial court's discretion to determine whether a defendant was prejudiced by the incident that is the basis of a motion for a mistrial. Id. On appeal, our standard of review is whether the trial court abused that discretion.

Appellant acknowledges that his prior convictions stem from the severe beating of H.P., the four-year-old son of Appellant's prior girlfriend, when

- 7 -

Appellant was alone with H.P. However, he maintains that the trial court should not have permitted the Commonwealth to make numerous references to his prior convictions throughout the trial, noting that the prosecutor referenced Appellant's prior convictions in her opening and closing statements, when she discussed the convictions and argued that Appellant had concealed from the victim's family—and lied to police about—his last name because of his prior convictions. The prosecutor also discussed Appellant's prior convictions during the direct examination of Detective McCue, who identified sixteen exhibits of H.P.'s injuries, and discussed in detail the facts surrounding H.P.'s beating. The Commonwealth additionally revisited Appellant's prior convictions during the direct examination of Ms. Vojtash and her uncle, James Vojtash, when the prosecutor asked whether they or anyone in their family had known Appellant's last name or about his prior convictions.

According to Appellant, the references to his prior convictions had no purpose other than to prejudice him in the minds of the jury. He claims that the convictions were not relevant to prove opportunity, identity, or a chain or sequence of events; nor were they relevant to rebut any claim of accident, mistake, or lack of intent, as Appellant did not assert those defenses. While Appellant concedes that prior bad acts may be admissible to prove a common plan or scheme, he asserts that "the two incidents are too attenuated to be considered a signature crime or similar scheme or plan." Appellant's brief at 17. He points to the differences in the crimes, noting the ages of the victims,

their gender, the placement and severity of their injuries, that the incidents occurred nineteen months apart, and that Appellant was only with the victim for a few minutes, whereas he was with Hunter for several hours.

Appellant further argues that, even if the convictions were relevant for an admissible purpose, their probative value was substantially outweighed by their prejudicial impact. He claims that his presumption of innocence was stripped from him the moment the Commonwealth introduced his prior convictions. While Appellant acknowledges that the trial court provided a cautionary instruction to the jury, he claims that it did not remove the taint. Appellant maintains that he objected every time his prior convictions were mentioned, and contends that the trial court should have granted his request for a mistrial, since he was deprived of a fair and impartial trial.

In order for a claim of error to be preserved for appellate review, a party must make a timely and specific objection before the trial court. Commonwealth v. Olsen, 82 A.3d 1041, 1050 (Pa.Super. 2013). Our review of the record reveals Appellant did not, in fact, lodge an objection when the prosecutor asked Ms. Vojtash and James Vojtash whether they or anyone in their family had known about Appellant's prior convictions, or when the prosecutor discussed his prior convictions in her closing statement. See N.T. Trial, 5/22/17, at 92-93, 121; N.T. Trial, 5/30/17, at 567-8. Thus, those challenges are waived.

With respect to Appellant's preserved objections to the references to his prior convictions, our Supreme Court has "long recognized an exception to the general inadmissibility of other crimes evidence where there is a striking similarity—or logical connection—between the proffered prior bad acts and the underlying charged crime." Commonwealth v. Hicks, 156 A.3d 1114, 1125 (Pa. 2017). Here, we believe that this standard is met, as both the victim and H.P. were the small children of women that Appellant was dating and who sustained severe beatings when left alone in his care. See Hicks, supra at 1127 ("[T]he evidence about appellant's prior relationships with and assaults upon Alston, Washington and Chavez showed they were strikingly similar to the circumstances surrounding his relationship with the victim, her injuries, and her subsequent death, such that there was a logical connection between them."); see also Commonwealth v. Boczowski, 846 A.2d 75, 89 (Pa. 2004) ("Given the remarkable similarity between the manner in which both of appellant's wives were killed, evidence concerning the circumstances of Elaine's death supported a reasonable inference that Maryann's death was not accidental, but rather, was a result of appellant's deliberate act.").[2]

However, in Hicks, our Supreme Court also recognized that "[w]here a logical connection between the other crimes and the underlying charged crime

_____

[2] The trial court explained, evidence of Appellant's prior bad acts was admissible to "the chain of events and pattern of abuse . . . [Appellant's] intent and malice toward the victim and absence of mistake . . . [and] a common scheme or plan." Trial Court Opinion, 4/9/18, at 20.

has been established . . . the court must also determine whether the probative value of the evidence outweighs any unfair prejudice." Hicks, supra at 1128 (citing Pa.R.E. 404(b)(2)). "Obviously, the impact of introducing evidence of other crimes is significant and may be highly prejudicial. However, such evidence is also highly probative when the Commonwealth's case is otherwise based largely on circumstantial evidence." Id. (citations omitted); see also Boczowski, supra (concluding that evidence of the similarity of the manner in which his first wife died was highly relevant in his murder trial of his second wife, and that its probative value outweighed any potential for unfair prejudice).

In this case, the trial court considered the potential for prejudice, observing that it was "obliged to balance the probative value of the evidence against its prejudicial impact," and that "prejudicial evidence may be admissible so long as it is not unduly so." Trial Court Opinion, 4/9/18, at 20. The trial court also provided cautionary instructions to the jury, both immediately after Detective McCue testified and during closing instructions, limiting the manner in which it could consider the prior convictions, and admonishing it from considering the conviction as evidence of Appellant's propensity to commit the crimes at issue. N.T. Trial, 5/30/17, at 72-73, 585-

86.[3]  On the facts herein, as in Hicks, "the probative value of the evidence to the Commonwealth's largely circumstantial case clearly outweighed any unfair prejudicial effect, which was properly limited by the trial court's cautionary instructions to the jury."  Hicks, supra at 1129; see also Commonwealth v. Harris, 817 A.2d 1033, 1053 (Pa. 2002) (holding that a jury is presumed to follow the trial court's instructions on the law).  We find no abuse of discretion in the trial court's evidentiary rulings, or in its denial of Appellant's request for a mistrial.  Accordingly, Appellant's first issue fails.

In his second issue, Appellant claims that the trial court abused its discretion in denying, in part, his motion in limine to exclude portions of the two-hour-long interrogation video.  Appellant concedes that the Commonwealth was entitled to use parts of the video, including anything he said, and any question posed to him by police that was designed to elicit his version of events.  Appellant's brief at 25-26.  However, Appellant maintains

_____

[3] When providing final instructions to the jury, the trial court provided the following cautionary instruction about Appellant's prior convictions:

> This evidence is before you for the purpose of tending to show opportunity, intent, common scheme, or plan and the identity and the absence of mistake or accident with respect to the incident that occurred.  [T]he evidence must be considered by you in no other way.  You may not regard this evidence as showing that [Appellant] is a person of bad character or criminal tendencies which might incline you to find guilt.  You may consider it only for the purpose that I've set forth to you.

N.T. Trial, 5/30/17, at 585-86

that "[t]he evidence contained on the video . . . allow[ed] the police to testify to matters not in evidence, to cross[-]examine [Appellant] when he did not take the witness stand at trial, and to use inflammatory and prejudicial statements to bias the jury against [Appellant]." Id. at 25. In response, the Commonwealth argues that Appellant waived several aspects of his present challenge to the admission of the interrogation video. Commonwealth's brief at 45-46.

At the hearing on pretrial motions, Appellant's counsel offered the following generalized argument regarding police statements in the interrogation video:

> It's 80 percent a statement on speech from police detectives about medical things they have no competency to testify, legal opinions which they have no competency to testify, hearsay evidence, facts not in evidence, facts which aren't true, calling my client "evil person." You know it's not - - the jury, under no circumstances would be permitted to hear that if it were in the courtroom. And I object to the Commonwealth playing them in this statement and the jury hearing them.

> [O]ur concern with the discussions related to the plea is that the police officers go beyond simply stating that he previously pled guilty. They go on to make the implication - - by calling him evil, we think it would prejudice the jury in a very - - it's very highly prejudicial for the jury to hear.

N.T. Pretrial Hearing, 5/17-19/15, at 27-28, 39-40. Although Appellant filed several pretrial motions, he did not specifically challenge any police statements in the video until the pretrial hearing. See Omnibus Pretrial Motion, 7/24/15, at unnumbered 2, 7 (where Appellant moved in limine to preclude, inter alia, the admission of unspecified statements that he made at

the time of his arrest and interrogation, and made no reference to police statements).[4]   At the pretrial hearing, Appellant's counsel did not recite any specific police statement, nor did he identify the legal ground relied upon for the exclusion of any particular police statement.  Instead, he merely identified the page and line numbers of sixty-five portions of the transcript of the video which he contended should be redacted, without additional explanation or argument.   See id. at 44-45.   The trial court took the matter under advisement, and thereafter agreed to redact several parts of the video, but denied Appellant's request to redact the remaining portions.

During trial, when the Commonwealth moved to admit the interrogation video into evidence, Appellant's counsel advised the trial court that, earlier that day, he had filed a motion in limine memorializing Appellant's objections to the unredacted portions of the video, as stated at the pretrial hearing.  The trial court indicated that it had not seen the newly-filed motion, and requested a copy.  In the motion, Appellant argued that (1) although the trial court had ruled that the Commonwealth could introduce his prior convictions for a limited purpose under Pa.R.E. 404(b), commentary made by police officers in different segments of the video exceeded that purpose and "impermissibly draw the conclusion that because [Appellant] previously pled guilty to charges involving children, he must be guilty of the instant offenses;" (2) "[s]egments

_____

[4] On appeal, Appellant does not challenge the statements that he made during the interrogation video.

- 14 -

of the video discussing the fact that drugs were located with [Appellant's] belongings in the third floor bedroom . . . constitutes impermissible [Pa.R.E.] 404(b) evidence of which [Appellant] was never provided the required notice;" (3) [t]he officers' comments "I think you're pure evil (among others) are impermissible pursuant to [Pa.R.E.] 403, as they serve only to inflame the passions of the jury and play to the emotional nature of the case;" and (4) "[t]he officers' comments concerning child abuse and the medical condition of [victim] are impermissible, as the officers are not medical experts qualified to provide any opinion under [Pa.R.E.] 701 and 702." Motion in Limine, 5/25/17, at 6-7. The trial court denied the motion in limine. Appellant made no further objections, and the partially redacted interrogation video was played for the jury. Appellant filed a post-sentence motion raising the same four arguments stated in the motion in limine.

On appeal, Appellant asserts several new grounds for exclusion of the remaining unredacted portions of the video. In addition to police statements referencing Appellant's evil character and prior convictions,[5] he claims, for the first time, that the police statements also violate his Fifth and Sixth Amendment rights; improperly call him a liar; are generally irrelevant and/or

_____

[5] Appellant has apparently abandoned his arguments that the trial court erred by denying his motion in limine as to police statements concerning (1) child abuse and the medical condition of the victim under Pa.R.E. 701 and 702; and (2) Appellant's drug use and possession on the basis that the Commonwealth did not provide notice of its intent to reference such evidence as required by Pa.R.E. 404(b)(3).

- 15 -

constitute impermissible lay opinion; violate Pa.R.E. 611(a) as being argumentative and compound; improperly reference Appellant's prior lawyer; improperly reference his drug use and possession on the basis that such evidence is irrelevant and prejudicial; and improperly inquire about the victim's family.

As indicated previously, in order to preserve a claim that the trial court erred in overruling an objection, a party must make a timely and specific objection before the trial court. Pa.R.E. 103(a)(1)(B); see also Olsen, supra at 1050. Where a litigant objects to evidence on appeal on a different ground than that asserted at trial, we will not consider the new objection since it has not been properly preserved for appellate review. Stulz v. Boswell, 453 A.2d 1006, 1010 (Pa. 1982); see also Mitchell v. Gravely Int'l, 698 A.2d 618, 621 (Pa.Super. 1997) (holding that a party complaining on appeal of the admission of evidence objected to in the court below will be limited to the specific objection made at trial).

At trial, Appellant identified only four bases for redaction of the police statements in the interrogation video: police references to his prior convictions exceeded the limited use permitted under Pa.R.E. 404(b); the Commonwealth failed to provide notice of its intent to reference his drug possession and usage as required by Pa.R.E. 404(b)(3); police statements that Appellant had an evil character violated Pa.R.E. 403; and police improperly referenced the child abuse and victim's medical condition in violation of Pa.R.E. 701 and 702.

Thus, only these challenges to the interrogation video are preserved for our review. See Pa.R.A.P. 302(a); Pa.R.E. 103(a)(1)(B); see also Commonwealth v. Gordon, 246 A.2d 325, 327-28 (Pa. 1968) (holding that where the introduction of evidence is objected to at trial for a specific reason, other reasons are waived and may not be asserted post-trial for the first time).

With respect to police statements in the interrogation video referencing Appellant's prior convictions, we have already determined, supra, that, on the facts herein, the probative value of the references at trial to Appellant's prior convictions outweighed any unfair prejudice, which was properly limited by the trial court's cautionary instructions to the jury. As we apply this same analysis to such references in the interrogation video, we conclude that the trial court did not abuse its discretion in declining to redact police statements referencing Appellant's prior convictions.

With respect to police statements in the interrogation video calling him "evil," Appellant relies exclusively on Commonwealth v. Kitchen, 730 A.2d 513 (Pa.Super. 1999), wherein this Court affirmed the trial court's redaction of portions of an interrogation video where the police, either directly or indirectly, accused the defendant of lying. In so ruling, we held that "[w]hen the troopers stated to [the defendant], 'You're lying,' or 'We know that you're lying' or phrases to that effect, their statements were akin to a prosecutor offering his or her opinion of the truth or falsity of the evidence presented by a criminal defendant, and such opinions are inadmissible at trial." Id. at 521.

Notably, Kitchen did not involve any police statements implying or stating that the defendant had an evil character. Rather, the Kitchen Court was concerned with police statement's regarding the defendant's veracity. We believe this distinction is critical. A reference to a defendant's character as evil cannot be equated with offering an opinion as to the truth or falsity of his or her statements.

Moreover, the only police statement using the word "evil" that Appellant identified in his brief is the following statement by Detective Fleske, "What I'm saying is, like I said before, I don't think you're evil." Appellant's brief at 29 (citing Interrogation Video Transcript, 12/10/14, at 68). Contrary to Appellant's claim otherwise, the detective clearly did not call him evil in this instance.

In his argument, Appellant references the portion of the transcript of the interrogation video that he asserts supports his claim that the officers called him evil. However, while our review of the transcript reveals several other remarks by police using the word "evil," most, like the one referenced above, consist of Detective Fleske's comments that he does not believe that Appellant is evil. See Interrogation Video Transcript, 12/19/14, at 65-66.

In another reference, Detective Fleske posed the following question: "You saw it off in the past. You think you're an evil person?" Id. at 65. Appellant responded to that question by stating "I do not." Id. According to Kitchen, objectionable comments contained in question format are

admissible. See Kitchen, supra at 522 ("None of these police inquiries need to be redacted from the videotapes since they were in question form, did not involve an opinion as to the truth or falsity of [a]ppellee's statements or an opinion as to the guilt of [a]ppellee, and [a]ppellee offered responses to the inquiries.").

In two instances, however, Detective Laney actually called Appellant evil.

> DETECTIVE LANEY: See, I kind of disagree totally with him and this isn't a good cop-bad cop. I think you are absolutely evil. I think you prey on children. I think that's your MO. I think that you severely beat a developmentally disabled kid again. It's not you but I pled guilty to it. You have relationships with these women that have zero self-esteem who anybody that came along that seemed half decent, all outward appearances, you look like a decent guy but again, somewhere in your life your train got derailed. For lack of better words you're all fucked up now. You have been for a while. You don't plead guilty to something you didn't do.

Appendix G (Interrogation Video Transcript, 12/19/14, at 70).

> DETECTIVE LANEY: It's not good, pal. It's not good. Down at the ACJ, state prison, you're a baby killer. Now, if I listen to him, he thinks that you know the difference between good and evil. I totally disagree. I'm being a hundred percent honest. I think you are pure evil but if there's any remorse in your [sic] whatsoever, the only thing I'm holding out of, the only thing, the only hope that I'm holding out for you is I think something happened to your [sic] personally.

Appendix H (Interrogation Video Transcript, 12/19/14, at 75).

Detective Laney's statements cannot be read in a vacuum. When examined in the context of the transcript of the interrogation video as a whole, it is clear that the detectives are confronting Appellant with his aggravated

assault and EWOC convictions for the severe beating of four-year-old H.P., a developmentally disabled child, in an effort to elicit a confession from Appellant regarding the injuries inflicted upon K.N. While Detective Laney's accusations that Appellant is evil are clearly prejudicial, they appear to be made in reference to the fact that Appellant pled guilty to beating H.P. We have already determined, supra, that the probative value of Appellant's prior convictions outweighed their prejudicial impact. Since Detective Laney's comments were made in reference to those convictions, of which the jury was already aware, we deem any error in their admission to be harmless. See Commonwealth v. Hughes, 639 A.2d 763, 771 (Pa. 1994) (holding that where the objectionable statement was merely cumulative of other evidence already admitted, the admission is harmless); see also Commonwealth v. Green, 162 A.3d 509, 519 (Pa.Super. 2017) (en banc) ("Not all errors at trial . . . entitle an appellant to a new trial, and [t]he harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial ...." (citation omitted)). Hence no relief is due on Appellant's second issue.

In his third issue, Appellant contends that the trial court should have granted a mistrial when Dr. Omalu testified beyond the scope of his expert report. According to Appellant, Dr. Omalu improperly testified regarding the rotation of the brain inside the skull, the evaluation of the spinal cord, retinal injuries and shaken baby syndrome. Appellant claims that he was denied the

opportunity to meaningfully respond to Dr. Omalu's testimony because he could not predict that the doctor would testify to matters outside of his expert report. According to Appellant, the trial court should have granted a mistrial, since he was denied the fair opportunity to prepare a cross-examination of the doctor. Appellant's brief at 23-24.

Although there are no rules of procedure in criminal cases precisely governing the scope of expert trial testimony,[6] it cannot be asserted that either the Commonwealth or a defendant has carte blanche to allow an expert to testify beyond the information contained in his or her report. Commonwealth v. Roles, 116 A.3d 122 (Pa.Super. 2015). To hold

_____

[6] Pennsylvania Rule of Criminal Procedure 573 pertains to pretrial discovery in criminal proceedings, and provides, in relevant part, as follows:

(B) Disclosure by the Commonwealth.

(1) Mandatory. In all court cases, on request by the defendant, and subject to any protective order which the Commonwealth might obtain under this rule, the Commonwealth shall disclose to the defendant's attorney all of the following requested items or information, provided they are material to the instant case. The Commonwealth shall, when applicable, permit the defendant's attorney to inspect and copy or photograph such items.

. . . .

(e) any results or reports of scientific tests, expert opinions, and written or recorded reports of polygraph examinations or other physical or mental examinations of the defendant that are within the possession or control of the attorney for the Commonwealth;

Pa.R.Crim.P. 573(B)(1)(e).

otherwise would eviscerate the requirement that reports be disclosed. *Id.* In *Commonwealth v. Stith*, 644 A.2d 193 (Pa.Super. 1994), this Court discussed the civil rules in the context of a criminal case. There, the appellant conceded that no criminal case law discussed the proper remedy when "the Commonwealth introduces expert testimony exceeding the scope of an expert report." *Id.* at 197. Therefore, *Stith* relied on Pa.R.C.P. 4003.5(c), and civil jurisprudence governing expert reports to argue that an expert is not permitted to testify beyond the scope of his report. Rule 4003.5(c) states in pertinent part,

> (c) To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings . . . his direct testimony at trial may not be inconsistent with or go beyond the fair scope of his testimony in the discovery proceedings as set forth in his … separate report . . . However, he shall not be prevented from testifying as to facts or opinions on matters on which he has not been interrogated in the discovery proceedings.

Pa.R.C.P. 4003.5(c). In *Stith*, however, this Court concluded that the expert did not testify beyond the fair scope of his report.

Instantly, Dr. Omalu prepared an expert report dated April 22, 2017, and a supplemental expert report dated May 7, 2017. He indicated that, in conducting his independent assessment of the case, he reviewed the medical records, autopsy report, neuropathology report, autopsy pictures, tissue histological slides, and Ms. Vojtash's statement. Omalu Supplemental Report, 5/7/17, at 2. He concluded that "[t]he total configurations and constellations of patterns of traumas noted and observed on [the victim] are diagnostic of,

and consistent with Non-Accidental Trauma in a Child induced by an adult caregiver who was in sole custody of the child." Id. Further, in both reports, he indicated that he "agree[d] with the findings, interpretations and diagnosis stated in the medical records by the clinicians who attended to [the victim,] . . . in the autopsy report by Dr. Shakir[, and] in the neuropathology report by Dr. Clark." Omalu Report, 4/22/17, at 3; Omalu Supplemental Report, 5/7/17, at 2.

Notably, at trial, Dr. Berger, the on-call pediatrician who evaluated the victim for signs of child abuse upon her admission to Children's Hospital and clinically diagnosed her with abusive head trauma, testified that she reviewed the x-rays and CT scans taken of the victim which reflected "extensive retinal hemorrhaging in both of the eyes . . . and that virtually never occurs except in cases of abusive head trauma or shaken baby." N.T. Trial, 5/23/17, at 255-56, 270-71. Dr. Shakir, who performed an autopsy of the victim and concluded that she died of blunt force trauma to the head as a result of homicide, testified regarding the extensive brain injuries suffered by the victim, as well as his evaluation of her spinal cord. Id., 5/25/17, at 397, 401, 404, 417.

Dr. Omalu's expert reports specifically indicated that he agreed with the findings, interpretations and diagnosis of Dr. Shakir and the clinicians who attended to the victim, which were admitted into evidence. Thus, his opinions were not a surprise to Appellant. None of his testimony was beyond the fair

scope of his reports since a "fair extension" of his reports would be to explain the very findings, interpretations and diagnosis with which he agreed. The fact that Dr. Omalu's report did not specifically refer to the rotation of the brain inside the skull, the evaluation of the spinal cord, retinal injuries and shaken baby syndrome is of no moment, as he implicitly referenced those findings. Because we conclude that Dr. Omalu's testimony was a fair extension of his report, the trial court did not abuse its discretion by refusing to grant a mistrial following his expert testimony at trial.

Even assuming, arguendo, that Dr. Omalu's testimony exceeded the scope of his expert reports, Appellant would not automatically be entitled to a new trial, since he must also establish "that the introduction of the expert testimony caused him prejudice to the degree that it affected his trial strategy or likely affected the outcome of the proceedings." Roles, supra at 133 (citations omitted). Here, Appellant has shown no prejudice from Dr. Omalu's testimony. Beyond his bald allegations of prejudice, Appellant's brief is devoid of any assertion that Dr. Omalu's testimony changed or impacted his trial strategy. Nor does he demonstrate, much less argue, that the expert testimony likely affected the outcome of the proceedings. See id. Accordingly, Appellant's third issue is without merit.

In his final issue, Appellant contends that the evidence was insufficient to support his convictions.

> [O]ur standard of review of sufficiency claims requires that
> we evaluate the record in the light most favorable to the verdict

- 24 -

winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Nevertheless, the Commonwealth need not establish guilt to a mathematical certainty. [T]he facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence. Any doubt about the defendant's guilt is to be resolved by the fact finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact can be drawn from the combined circumstances.

Commonwealth v. Franklin, 69 A.3d 719, 722 (Pa.Super. 2013) (citations and quotation marks omitted).

With respect to his third-degree murder conviction, Appellant claims that the Commonwealth failed to establish the element of malice because none of the witnesses who testified saw him touch or harm the victim on the night in question, or heard any loud noise consistent with the injuries sustained. He argues, without any explanation, that Dr. Berger testified that it takes forty-eight to seventy-two hours for a brain to swell, Dr. Shakir stated that the fracture in the victim's humerus was seven to ten days old, and Dr. Omalu testified that the victim's symptoms could manifest in less than two hours. Appellant also points to Ms. Vojtash's statement that the victim made the same cry earlier in the day that she made that night, and notes that he was not at the home when the earlier cry was made. With respect to his aggravated assault conviction, Appellant baldly contends that the Commonwealth failed to present any evidence that he acted knowingly, intentionally, or recklessly. Similarly, Appellant asserts that the evidence

supporting his EWOC conviction is insufficient because the Commonwealth failed to establish that he acted knowingly to endanger the victim or that he was a caregiver to her. For the reasons explained infra, all of these arguments fail.

As developed by case law, the elements of third-degree murder are (1) a killing; and (2) legal malice. Appellant's sufficiency claims assails the evidence that the Commonwealth presented to establish that he acted with malice. Malice exists where there is a particular ill-will, and also where there is a wickedness of disposition, hardness of heart, wanton conduct, cruelty, recklessness of consequences and a mind regardless of social duty. Commonwealth v. Golphin, 161 A.3d 1009, 1018 (Pa.Super. 2017). Further, "[t]he Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence." Id.

Instantly, the Commonwealth adduced evidence during the trial court to prove beyond reasonable doubt that Appellant acted with malice. Indeed, the court produced ample medical evidence that K.N. died of non-accidental trauma to the brain and that Appellant was the only person with the child when the injuries occurred. Recall that Dr. Berger testified that she evaluated K.N. for signs of child abuse and clinically diagnosed her with abusive head trauma indicative of shaken baby syndrome. N.T. Trial, 5/23/17, at 255-56, 270-71. Likewise, Dr. Omalu provided a similar conclusion that the child's

injuries "are diagnostic of, and consistent with Non-Accidental Trauma in a Child induced by an adult caregiver who was in sole custody of the child." Omalu Supplemental Report, 5/7/17, at 2.

Similarly, to the extent that the crux of Appellant's claim is that the Commonwealth neglected to identify him as the perpetrator of abuse, that assertion also fails. Ms. Vojtash's testimony established that Appellant was alone with the baby when the injuries occurred. Specifically, Ms. Vojtash testified that immediately prior to the incident, she, Appellant, and five-and-one-half-month-old K.N. were in the third floor bedroom of the residence that Ms. Vojtash and her three children shared with several other family members. K.N. was sleeping in her crib when Ms. Vojtash left her and Appellant alone in the room to go to the first floor and prepare snacks for her son and some of her nieces who were visiting. N.T. Trial, 5/22/17, at 151-52. Ms. Vojtash was away from the room approximately ten minutes when her brother alerted her that he heard the baby screaming from the third floor. Id. at 153-54. Ms. Vojtash ran up the stairs and found K.N. in her crib crying, and Appellant standing at the foot of the crib. Id. at 154. When she asked Appellant what happened, he responded, "he didn't know. [K.N.] just started crying." Id. at 155.

When viewed in favor of the Commonwealth as the verdict winner, the foregoing testimony establishes beyond a reasonable doubt that K.N. was alone with Appellant when she received non-accidental trauma to the brain.

Appellant's arguments to the contrary are misplaced. Plainly, his references to the medical testimony concerning the development of the injuries and his concomitant contention that none of the witnesses observed him harming K.N. on the night of the incident challenge the weight of the fact-finder's determinations rather than the sufficiency of the evidence that the Commonwealth adduced to prove each element of murder beyond a reasonable doubt. As the Commonwealth's evidence is not "so patently unreliable that the jury was forced to engage in surmise and conjecture in arriving at [the] verdict[,]"no relief is due. Commonwealth v. Brown, 52 A.3d 1139, 1166 (Pa. 2012) (addressing sufficiency claim through the lens of allegedly unreliable and/or contradictory evidence).

Appellant's final two sufficiency claims are conclusory statements asserting that the Commonwealth failed to prove the mens rea for aggravated assault of a child and EWOC, respectively. Again, Appellant's claims fail.

A person commits aggravated assault of a child when he "attempts to cause or intentionally, knowingly or recklessly causes serious bodily injury to a child less than 13 years of age[.]" 18 Pa.C.S. § 2702(a)(9). Likewise, with regard to EWOC, a person supervising the welfare of a child commits the offense if he "knowingly endangers the welfare of a child by violating a duty of care, protection or support." 18 Pa.C.S. § 4304(a). The testimony that we outlined supra in addressing Appellant's murder conviction also sustains the Commonwealth's burden of prove as to the instant offenses. Stated plainly,

the medical testimony and circumstantial evidence established that, while tending to the five-and-one-half month old baby that Ms. Vojtash left in his supervision, Appellant knowing violated his duty of care by causing the child to suffer severe head trauma which Dr. Berger and Dr. Omalu both diagnosed as intentional child abuse. N.T. Trial, 5/23/17, at 255-56, 270-71; Omalu Supplemental Report, 5/7/17, at 2. Appellant's sufficiency argument cannot succeed.

Judgment of sentence affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 7/25/2019